95 F.3d 153
 41 Cont.Cas.Fed. (CCH) P 76,981, 45 Fed. R.
Evid. Serv. 745
UNITED STATES of America, for the use and benefit of
EVERGREEN PIPELINE CONSTRUCTION CO., INC., Plaintiff,
Evergreen Pipeline Construction Co., Inc.,
Plaintiff-Appellant/Cross-Appellee,
v.
MERRITT MERIDIAN CONSTRUCTION CORP. and General Insurance
Company of America, Defendants-Appellees/Cross-Appellants.
MERRITT MERIDIAN CONSTRUCTION CORP., Third Party
Plaintiff-Appellant/Cross-Appellee,
v.
TRANSAMERICA PREMIER INSURANCE COMPANY, INC., Third Party
Defendant-Appellee/Cross-Appellant.
 Nos. 1228, 1655-1657, Dockets 95-7791, 95-7830, 95-7841 and 95-7850.
 United States Court of Appeals,
Second Circuit.
 Argued April 12, 1996.
Decided Sept. 6, 1996.
 
 1
 James N. Cahill, Endicott, NY (Cahill & Beehm, Endicott, NY, on the brief), for Plaintiff-Appellant/Cross-Appellee Evergreen Pipeline Construction Co., Inc.
 
 
 2
 Daniel L. Saxe, New York City, for Defendant-Appellee/Cross-Appellant/Third Party Plaintiff-Appellant/Cross-Appellee Merritt Meridian Construction Corp.
 
 
 3
 Cecil Holland, Jr., New York City (Benjamin D. Lentz, Hart & Hume, New York City, on the brief), for Defendant-Appellee/Cross-Appellant General Insurance Company of America.
 
 
 4
 James M. Mulvaney, Morristown, NJ (McElroy, Deutsch & Mulvaney, Morristown, NJ, on the brief), for Third Party Defendant-Appellee/Cross-Appellant Transamerica Premier Insurance Company, Inc.
 
 
 5
 Before KEARSE and ALTIMARI, Circuit Judges, and MORAN, Senior District Judge.*
 
 MORAN, Senior District Judge:
 
 6
 "Major construction projects generate major construction litigation. Management of either is perilous."[1]
 
 
 7
 This is an appeal from the final judgment of the United States District Court for the Southern District of New York (Denny Chin, J.) entered on July 12, 1995, following a jury verdict in favor of plaintiff Evergreen Pipeline Construction Co., Inc. (EPC or Evergreen) and against defendant Merritt Meridian Construction Corp. (MMCC or Merritt), and its surety, General Insurance Company of America (GICA or General). The district court's opinion is reported at United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt-Meridian Constr. Corp., 890 F.Supp. 1213 (S.D.N.Y.1995). Merritt is challenging certain of the district court's evidentiary and post-trial rulings and the sufficiency of the evidence to support the jury's verdict in favor of Evergreen. Evergreen is challenging the dismissal of two of its claims and is seeking greater sanctions and reimbursement for its costs. We conclude that a new trial is required as to one issue, further consideration (and possibly a new trial) as to another, and in other respects we affirm.
 
 BACKGROUND
 
 8
 Merritt entered into a general contract with the United States Department of Army Corps of Engineers (Corps) for the modernization and expansion of academic facilities, Phase 1B, at the United States Military Academy, West Point, New York. The contract amount was $12,500,000.
 
 
 9
 Jack DeLello (DeLello) and Dennis Capolino (MMCC's corporate secretary) entered into the subcontract at issue in this case on August 13, 1987. DeLello's company, Evergreen, specializes in pipeline installation and was to perform the pipe-trenching and installation work for $400,000, trench rock-blasting and removal for $90 per cubic yard, and mass rock-blasting and removal for $35 per cubic yard, beginning August 17, 1987.
 
 
 10
 The following recitation of the facts (which are in accord with the jury's findings) is taken from Judge Gerard L. Goettel's[2] Memorandum Decision of October 1, 1991:
 
 
 11
 When [EPC] arrived on the site, there was no subcontract work to do. Instead, Evergreen began unloading pipe shipments from trucks and over the next three weeks, dug test holes, hauled trash, did miscellaneous demolition and unloaded pipes. None of this work was within the scope of the contract with Merritt-Meridian. The actual contract work did not begin until November 2, 1987--one reason was that the required materials did not arrive until that time. Evergreen claims that other interferences such as the failure by Merritt-Meridian to provide necessary surveying further delayed its performance. [Footnote: Merritt-Meridian backcharged Evergreen for delays. It should be noted, however, that the Army Corps gave extensions to and compensated Merritt-Meridian for damages caused by the delays, although these were not then passed on to Evergreen.]
 
 
 12
 Evergreen continued to work through the winter. It was not, however, receiving payments for the full value of its services because allegedly Merritt-Meridian would not pay for part of the work, claiming that it would not be paid by the Corps for the mass rock drilling and blasting until the mass rock quantities were determined by survey. (Information obtained during discovery indicates that Merritt-Meridian was in reality being paid for the work.) Any bills submitted by Evergreen were reduced in amount by Merritt-Meridian and then not honored. Because Evergreen was not receiving enough cash to meet its own expenses, it was running out of money. When it needed funds to meet its payroll, Merritt-Meridian advanced Evergreen the money on the condition that Evergreen and DeLello execute a promissory note and confession of judgment for $80,000.
 
 
 13
 Cash flow problems continued for Evergreen. By the end of 1987, Evergreen claims that it had only received total payments of roughly $179,000 but had in reality performed over $500,000 worth of work. By April 1988, payments of $355,000 had been made to Evergreen although, as Merritt-Meridian acknowledges, work valued at $670,000 had been performed. These discrepancies were justified by Merritt-Meridian by backcharges for equipment rental and other items.
 
 
 14
 With one day of blasting left, Merritt-Meridian terminated Evergreen. The reason offered was Evergreen's failure to pay its insurance premiums for liability coverage. In the past, Merritt-Meridian had either advanced money to Evergreen for the premium payment or paid the premium itself.
 
 
 15
 On January 24, 1989, Evergreen filed a complaint pursuant to the Miller Act, 40 U.S.C. §§ 270a-270dd (1994), against Merritt and its performance and payment surety, General. EPC sought $860,628.32 in compensatory damages for MMCC's alleged breach of the subcontract; EPC also alleged a prima facie business tort, seeking $860,628.32 in withheld payments, $500,000 in lost profits and lost business opportunities and $3,000,000 in punitive damages. (Id.) In the spring of 1991 EPC added a third claim in quantum meruit to its complaint.
 
 
 16
 Judge Goettel consolidated the action with MMCC's action initially filed in state court for payment of the $80,000 on the promissory note. On April 3, 1991, defendants filed an answer and counterclaim. In its counterclaim MMCC sought $500,000 for EPC's alleged breach of contract and negligence, and $100,000,000 for an alleged RICO conspiracy by EPC and Transamerica Premier Insurance Co., Inc. (TPI or Transamerica), EPC's performance and payment bond surety, to defraud Merritt. On June 29, 1989, MMCC filed a third party complaint against TPI, alleging a breach of the performance bond and seeking $400,000. This was amended on April 3, 1991, by increasing the damages sought to $500,000 and adding a second cause of action and demand for damages similar to the RICO claim alleged in MMCC's amended counterclaim.
 
 
 17
 Sometime later, defendant moved for partial summary judgment which, on October 1, 1991, Judge Goettel granted in part and denied in part. He dismissed EPC's prima facie business tort claim for failure to allege "special damages" with sufficient particularity; however, he gave EPC leave to pursue its claim for punitive damages "through the cause of action in contract". In addition, the court refused to dismiss either the quantum meruit claim or the part of the breach of contract claim which was based on delay damages.
 
 
 18
 On April 6, 1992, TPI moved for partial summary judgment on all of the third party claims except count I. Magistrate Judge Mark D. Fox issued a Report and Recommendation on June 22, 1992, which Judge Goettel adopted on July 17, 1992, granting summary judgment on all but count I of the third party complaint. The court also granted TPI's motion for Rule 11 sanctions against MMCC's counsel (Stephen O'Hare) in the amount of $1,000 for bringing the RICO claim.
 
 
 19
 To encourage a settlement the court held a summary jury trial on February 10 and 11, 1993. The summary jury awarded EPC $672,324 for MMCC's breach of contract and $1,000,000 in punitive damages.
 
 
 20
 On June 15, 1993, MMCC and GICA, pursuant to Federal Rule of Civil Procedure 41, moved to voluntarily dismiss the remainder of the second amended third party complaint (count I) and to dismiss the second counterclaim. EPC opposed the motion, arguing that "it [would] be unduly prejudiced should [the court] grant defendants' motion to dismiss at this late stage of the litigation". TPI did not oppose the motion but sought sanctions as a condition of the dismissal pursuant to Rule 11. On July 2, 1993, Judge Goettel granted the motion to voluntarily dismiss and awarded both EPC and TPI attorneys' fees and costs, but held the determination of the amount until the final disposition.
 
 
 21
 Before the 1994 trial defendants filed a variety of motions in limine. At oral argument on October 6, 1994, Judge Chin granted defendant's motion to bar evidence regarding "previously dismissed parties or causes of action and [evidence of] prior or contemporaneous discussions and agreements offered as parole [sic] evidence," and he denied the request to dismiss the punitive damages claim. In an October 18, 1994 order, Judge Chin denied the motion to bar evidence regarding MMCC's profits on the West Point project and granted the motion to bar evidence of MMCC's relationships with other subcontractors. See United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt-Meridian Constr. Corp., No. 90-5106, 1994 WL 577637 (S.D.N.Y. Oct. 19, 1994).
 
 
 22
 Finally, in October and November 1994, the remaining claims were tried before a jury. At the close of all the evidence the court granted defendant's motion for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a), on the punitive damages claim. A jury verdict was entered upon a Special Verdict Sheet on the remaining issues on November 22, 1994. The jury found that MMCC materially breached the subcontract. It awarded EPC $22,350.51 for written change orders; $157,302 for delay damages; and $175,632 for extra work damages. The jury also found that EPC should have been paid $400,000 or the base contract amount; $204,570 for approved mass rock blasting and removal; and $158,095 for approved trench rock blasting and removal. It rejected EPC's quantum meruit claim.
 
 
 23
 The jury also determined that EPC had not materially breached the contract. It did find, though, that MMCC was entitled to backcharges in the amount of $47,651 and $10,400 for change order no. 2, and that it had made $440,464 in payments to EPC. In sum, the jury awarded EPC $619,434.51.
 
 
 24
 All parties filed post-trial motions. The district court denied defendants' alternative motions to set aside the verdict, or for a new trial, on the extra work and delay damages claims. See Evergreen, 890 F.Supp. at 1219-1225. It granted defendants' motion to set aside the jury verdict on plaintiff's alleged breach of contract insofar as MMCC should have been credited for its $30,398 in completion costs. Id. at 1223. The court also denied defendants' motion for a new trial, where it had argued that the introduction of evidence regarding punitive damages was prejudicial and the verdict was against the weight of the evidence. Id. at 1223-1224. The court granted EPC's cross-motions for prejudgment interest and awarded EPC, pursuant to Rule 11, $35,000 in attorney fees and costs against MMCC. Id. at 1225-28. It limited EPC's bill of costs to $13,888.36. Id. at 1228. The court awarded TPI $50,000 for MMCC's Rule 11 violations. Id. at 1229. The district court denied EPC's cross-motion for fees against GICA, id. at 1226, and for additional sanctions against both MMCC and GICA, id. at 1228. It granted EPC's motion under Rule 59(e) for an order compelling MMCC to enter a satisfaction of the $106,000 judgment entered against EPC in the state court proceeding. Id. at 1229. Finally, the court denied TPI's cross-motion for additional sanctions. Id.
 
 
 25
 All parties are appealing one or another of these rulings.
 
 DISCUSSION
 A. EVERGREEN'S CLAIM FOR PUNITIVE DAMAGES
 
 26
 At the conclusion of the proof the district court dismissed Evergreen's claim for punitive damages.[3] EPC appeals this decision, which is reviewable de novo, arguing that it was entitled to pursue this claim pursuant to its breach of contract claim. MMCC argues that the claim for punitive damages should have been dismissed since the prima facie business tort claim was dismissed.
 
 
 27
 Because the lower court entertained the punitive damages claim pursuant to the breach of contract claim, we will not dismiss it with the prima facie business tort claim. However, we affirm the lower court's decision to dismiss the punitive damages claim for failure to show any harm to the general public by MMCC's breach of contract.
 
 
 28
 Under New York law the purpose of awarding punitive damages is not to make the victim whole but to punish the defendant and to deter egregious conduct. E.g., Rocanova v. Equitable Life Assurance Society of the U.S., 83 N.Y.2d 603, 612 N.Y.S.2d 339, 342, 634 N.E.2d 940, 943 (1994) (vindicate public rights, not private wrongs) (citation omitted). Generally, punitive damages are not available for a breach of contract.
 
 
 29
 However, where the breach of contract also involves a fraud evincing a "high degree of moral turpitude" and demonstrating "such wanton dishonesty as to imply a criminal indifference to civil obligations," punitive damages are recoverable if the conduct was "aimed at the public generally" [citing Walker v. Sheldon, [10 N.Y.2d 401, 223 N.Y.S.2d 488] 179 N.E.2d 497 (N.Y.1961) ]. Punitive damages are available where the conduct constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and is sufficiently egregious under the Walker standard to warrant the additional imposition of exemplary damages. Thus, a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.
 
 
 30
 Rocanova, 612 N.Y.S.2d at 342-43, 634 N.E.2d at 943-44 (emphasis added). Contrary to EPC's assertions, the New York standard is not limited to matters between an insured and an insurer. Cf. Franco v. English, 210 A.D.2d 630, 620 N.Y.S.2d 156, 161 (3d Dep't 1994) (applying the pattern-of-conduct requirement in a fraud case brought by investors).
 
 
 31
 We can assume, arguendo, that certain of MMCC's conduct is actionable as independent torts, e.g., its alleged conversion of federal trust funds and fraud and coercion in securing the promissory note and confession of judgment. We might also assume that MMCC evidenced criminal indifference to its civil obligations insofar as it grossly inflated the backcharges and failed to pay EPC for work completed, and for which it received payment from the Corps. None of this, however, evinces a pattern of conduct harming the general public. Therefore, the district court properly dismissed EPC's claim for punitive damages made pursuant to its breach of contract claim.
 
 
 32
 B. EVERGREEN'S PRIMA FACIE BUSINESS TORT CLAIM
 
 
 33
 Under New York law there are four elements to a prima facie business tort claim: (1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful. See, e.g., Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 464 N.Y.S.2d 712, 720, 451 N.E.2d 459, 467 (1983) (citations omitted); Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566, 571 (2d Cir.1990); Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F.Supp. 1084, 1087-88 (S.D.N.Y.1988). Paragraph 19 of EPC's amended complaint alleges $500,000 in lost profits and lost business opportunities, and $860,628.32 in withheld payments. The district court dismissed Evergreen's prima facie business tort claim for failure to plead special damages with sufficient particularity. We agree with the lower court that this claim should have been dismissed, but our reasoning goes beyond that of the district court.
 
 
 34
 In addressing the district court's ruling, Evergreen contends that it can plead its lost profits and lost business opportunities with no greater specificity than $500,000, and that its claim for $860,628.32 in withheld payments is surely specific enough. It argues, further, that it cannot be made whole by recovery of lost profits and lost business opportunities, except by obtaining tort recovery.
 
 
 35
 We agree that the withheld payment allegation is specific, but it is entirely duplicative of contract damages. We also recognize that a plaintiff in these circumstances cannot precisely allege the amount of lost profits and lost business opportunities. Round numbers appear, however, not to be good enough under New York law, see, Leather Development Corp. v. Dun & Bradstreet, Inc., 15 A.D.2d 761, 224 N.Y.S.2d 513 (1st Dep't 1962) (per curiam ) (round sums state general, not specific damages), aff'd 12 N.Y.2d 909, 237 N.Y.S.2d 1007, 188 N.E.2d 270 (1963), and we here follow, rather than seek to justify, state law.
 
 
 36
 Moreover, Evergreen may well have been able to pursue lost profits and lost business opportunities as consequential damages pursuant to its breach of contract claim:
 
 
 37
 Loss of future profits as damages for breach of contract have been permitted in New York under long-established and precise rules of law. First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.
 
 
 38
 Kenford Co. v. County of Erie, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986) (per curiam ); Kenford Co. v. County of Erie, 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) (jury award for anticipated appreciation in land value reversed because parties did not contemplate these damages when contract was formed). It did not do so, and the claim is now waived.
 
 
 39
 Finally, we do not think that the restrictions upon damages for breach of contract claims can be avoided merely by recasting the breach as a tort. It has long been New York law that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.... This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656-57, 516 N.E.2d 190, 192 (1987) (citations omitted). Thus, a legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship or arise in connection with the nature of the injury, the manner in which the injury occurred and the resulting harm. Sommer v. Federal Signal Corp., 79 N.Y.2d 540, 583 N.Y.S.2d 957, 961, 593 N.E.2d 1365, 1369 (1992). That distinction has caused one court to conclude that if "a plaintiff has not suffered personal injury or property damage but is seeking merely the replacement cost of a product or enforcement of the bargain, it should proceed only on a contract theory. But if the plaintiff has suffered personal injury or property damage, particularly if the loss results from an 'abrupt, cataclysmic occurrence,' then a tort claim may be viable." Insurance Co. of North America v. Historic Cohoes II, 879 F.Supp. 222, 227 (N.D.N.Y.1995).
 
 
 40
 Here the tort claim relates solely to breach of a bargain, egregious though it may have been. Simply put, this is one of those contract cases which cannot be converted into a business tort, and the district court was correct in dismissing EPC's prima facie business tort claim.
 
 C. EVIDENTIARY RULINGS
 
 41
 Before reviewing issues respecting various contract claims, we turn to two evidentiary matters so as to dispose of the last punitive damages contention and to provide a context for the contract claims contentions.
 
 
 42
 Merritt appeals two of the district court's evidentiary decisions: (1) the admission of evidence regarding punitive damages, and (2) the admission of EPC's expert's use of "court board summaries." MMCC argues that the admission of punitive damages evidence (when the claim was eventually dismissed) prejudiced its breach of contract case and that there was no foundation for the summaries.
 
 
 43
 1. Punitive Damages Evidence/Gross Profits Evidence
 
 
 44
 Since the evidence of MMCC's gross profit was relevant to EPC's breach of contract claim, which was not dismissed, MMCC was not denied a fair trial by its admission. As the district court wrote:
 
 
 45
 First, the evidence of MMCC's profit was relevant because it supported plaintiff's claim that MMCC did not pay Evergreen for work that Evergreen did for which MMCC received payment from the Army Corps of Engineers. In other words, as Evergreen argued, the fact that MMCC exceeded its original expectations with respect to profit is evidence that it got away without paying Evergreen.
 
 
 46
 Second, proof of bad faith and malice were relevant in respects other than punitive damages. Plaintiff alleged, among other things, that MMCC breached the Subcontract by failing to deal in good faith and that the "no damage for delay" clause of the Subcontract was invalid due to MMCC's bad faith and willful, malicious conduct. Hence, I overruled defendants' objections and admitted evidence that was relevant to these claims of bad faith and fraud, that also was relevant to the issue of punitive damages. This evidence included: MMCC's handling of the confession of judgment and promissory note; MMCC's inflation of the backcharges; MMCC's receipt of payment for Evergreen's work and refusal in turn to pay Evergreen; and Dennis Capolino's purported statement when negotiating the backcharges that DeLello could try to litigate but that MMCC would tie him up for years.
 
 
 47
 On the other hand, I granted defendants' objections and refused to admit evidence that was relevant only to the punitive damages claim. This included evidence of MMCC's profits from other construction projects, its annual revenues, its total size and assets, and the Capolino family's annual income and total net worth.
 
 
 48
 Evergreen, 890 F.Supp. at 1224 (original emphasis). We find that the district court did not abuse its discretion in deciding that the probative value of this evidence was not substantially outweighed by its prejudicial effect. See Fed.R.Evid. 403.
 
 2. Expert Evidence
 
 49
 Plaintiff's expert's summary Schedule B (non-contract extra work) included evidence regarding gasline casing, surveying, and additional mass rock, and summary Schedule C included evidence of equipment standby, productivity loss (dewatering and loose rock), extended field conditions, and extended general conditions. The summaries were admitted pursuant to Fed.R.Evid. 1006.
 
 
 50
 In Fagiola v. National Gypsum Co. AC & S., Inc., 906 F.2d 53 (2d Cir.1990), the plaintiff objected to the defendants' use of court summaries to show how little of defendants' products had been sold to the decedent's workplace, thereby minimizing decedent's exposure to asbestos. Defendants' expert testified that the documents which provided the basis of the summaries were incomplete sales records for any of the defendant companies involved. In addition, many, but not all, of the underlying documents were authenticated during discovery. Plaintiffs objected at trial that the summaries were "horribly prejudicial," but the district court admitted them. The Second Circuit affirmed:
 
 
 51
 Similarly, we reject [plaintiff's] claim that the summary was more likely to confuse or to mislead the jury than it was to assist it....
 
 
 52
 Unlike the methods in [United States v.] Citron, [783 F.2d 307 (2d Cir.1986) ], [the expert's] methods were explained at length and are better described as tedious than as complicated....
 
 
 53
 In sum, the objections that [the expert's] summary did not fairly represent the documents and was excessively confusing and misleading go more to its weight than to its admissibility. See Kay v. Federal Rubber Co., 60 F.2d 454, 456 (3d Cir.1932). The ample cross-examination and [the district court's] careful instructions ensured that the jury was fully aware of the limitations of the summary and would not give it undue weight.
 
 
 54
 Fagiola, 906 F.2d at 57-58.
 
 
 55
 Here the expert testimony and summaries were necessary to make sense out of a mass of documentary matters, some 5,000 exhibits. Merritt contends that the testimony and summaries were based in considerable part upon documents not introduced into evidence and therefore should not have been admitted. That contention is misplaced. The district court spent a considerable amount of trial time determining whether or not this evidence was admissible. Basically, it was admitted only if the documents supporting this evidence existed, were admissible, had been made available to defendant or had been available if defendant had requested them and were available at trial, or if the testimony of other witnesses supported the expert's conclusions. Some evidence of this nature was excluded because the district court concluded that Evergreen could not show or represent that the underlying documents had been provided, even though Merritt had requested them. We have no doubt that the admitted evidence assisted the jury in determining what damages had been sustained and how the figures had been calculated, and Merritt had an ample and fair opportunity to cross-examine. Rules 1006, 703 and 705 require no more. The district court did not abuse its considerable discretion in admitting the evidence.D. EVERGREEN'S EXTRA WORK CLAIM
 
 
 56
 The jury awarded EPC $175,632 in extra work damages: $122,465 for drilling and blasting 3,449 cubic yards of mass rock, $12,000 for surveying costs, and $41,167 for miscellaneous work detailed in the daily analysis summary reports. Merritt motioned for judgment as a matter of law or a new trial--both were denied. In refusing to set aside the extra-claims jury verdict, the district court found substantial evidence supporting waiver or elimination of both the extra-work provision[4] and the notice provision[5] of the subcontract:
 
 
 57
 The record is clear that MMCC personnel closely supervised Evergreen's work, that MMCC asked Evergreen from time to time to perform work that was outside the scope of the Subcontract, that Evergreen performed the work, and that MMCC accepted the benefits thereof. The documentary evidence and the testimony at trial showed that Scaglione, Tony Phillips and Dennis Capolino kept a close watch on Evergreen and they knew very well what Evergreen was doing.
 
 
 58
 Moreover, a written change order (PX 72) was provided for Evergreen's work with respect to the unexpectedly large amount of subsurface mass rock. This work, which was included in plaintiff's "extra work" claim and was an "Addition to Contract Amount" (PX 72), accounted for $122,465 of the jury's award of $175,632 in damages for "extra work." Again, Scaglione testified that although MMCC was paid by the Army Corps for this work performed by Evergreen, MMCC did not pay Evergreen. While there were difficulties in the measurement of the rock, the jury could have reasonably found that it was MMCC's obligation to perform the measurements, for PX 72 states that the work was an "Addition to Contract Amount for Drilling and Blasting General Rock."
 
 
 59
 A portion of the orally requested work was the surveying work performed by surveyors hired by Evergreen. DeLello testified that MMCC repeatedly promised to provide surveyors so that Evergreen could advance its work. DeLello recalled for the jury a meeting at which Dennis Capolino promised him that MMCC would reimburse Evergreen if it would place the surveyors on its payroll. The work was done, at MMCC's request, and MMCC benefited from it.
 
 
 60
 Evergreen, 890 F.Supp. at 1220-1221. EPC's expert witness, David Alverson, provided evidence of EPC's damages:
 
 
 61
 David Alverson, a construction claim consultant, provided expert testimony on behalf of plaintiff. He testified that he reviewed extensive records regarding the Project, including account ledgers, schedules, correspondence, change orders, and payment records. Alverson presented his conclusions that MMCC owed Evergreen: $122,465 for drilling and blasting 3,449 cubic yards of mass rock, $2,500 for gasline casing work, $12,000 for surveying costs and $41,167 for work detailed in the daily analysis summary reports. The jury rejected the claim for extra work on the gasline casing, and calculated its award by adding together the other three categories for a total award of $175,632.
 
 
 62
 Id. at 1221 (footnote omitted). Therefore, the district court concluded that the jury's verdict was not " 'the result of sheer surmise and conjecture'." Id. (quoting Mattivi v. South African Marine Corp, "Huguenot", 618 F.2d 163, 168 (2d Cir.1980)).
 
 
 63
 Merritt mounts a twofold attack on this award. It argues that the notice provision was neither waived nor eliminated, and that no reasonable jury could have come to the conclusion it did because there was no evidence supporting the extra work damages.
 
 1. Generally
 
 64
 On an appeal from a denied motion for a judgment as a matter of law, an appellate court applies the same standard as the district court. See, e.g., Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 494 (2d Cir.1995); Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 232 (2d Cir.1991). We view the evidence in favor of the non-movant and give that party the benefit of all inferences. See, e.g., Logan v. Bennington College Corp., 72 F.3d 1017, 1022 (2d Cir.1995), petition for cert. filed, 65 USLW 3001 (June 17, 1996) (No. 95-2039). In addition, we do not weigh the evidence, assess the credibility of witnesses, nor substitute our opinion of the facts for the jury's opinion. Id. Judgment as a matter of law may be granted
 
 
 65
 [o]nly if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [the movant]....
 
 
 66
 LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir.1995) (internal quotations and citations omitted), cert. denied, Village of Airmont, N.Y. v. LeBlanc-Sternberg, --- U.S. ----, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996).
 
 
 67
 New York law permits an extra work damages claim "for extra work, orally directed, outside the scope of the contract, notwithstanding the provision that a claim for extra work must be supported by written authorization." Davis Accoustical Corp. v. National Surety Corp., 27 A.D.2d 624, 275 N.Y.S.2d 925, 927 (3d Dep't 1966) (citing La Rose v. Backer, 11 A.D.2d 314, 203 N.Y.S.2d 740, 746 (3d Dep't 1960)). Therefore, we will overturn the jury's verdict under one of two circumstances: (1) no reasonable juror could have concluded that EPC showed by a preponderance of the evidence that Merritt waived (either directly or by implication) the notice and extra work provisions; (2) no reasonable juror could have concluded that EPC showed the extra work damages awarded by a preponderance of the evidence.
 
 
 68
 2. $122,465 Additional Drilling and Blasting Claim
 
 
 69
 The jury awarded EPC $122,465 in damages for extra drilling and blasting work it completed. For the reasons stated in the district court's July 6, 1995 opinion, supra, we affirm the finding of waiver of the written notice provision as to this element of the extra work award. Whether EPC carried its burden of proof on the amount of damages is, however, a more difficult issue.
 
 
 70
 The detailed evidence in support of these damages came in, essentially, on cross examination. DeLello testified that the mass rock measurements were based on the drilling logs, which contained a record of every hole drilled and blasted. The mass rock calculations were based on "the depth and the pattern of--from the drilling logs plus the lineal foot of distance, turned into a cubic yard". In other words, it was a standard area calculation: height multiplied by width, multiplied by depth, divided by 27 feet, to arrive at cubic yards. DeLello used this method because "it appeared to [him] to be the best evidence to reconstruct what took place with regard to drilling and blasting, per quantities". DeLello testified that Alverson actually made the calculations.
 
 
 71
 Alverson testified that the procedure by which DeLello thought the calculations were made (the powder method) was not the method that formed the basis of the $122,465 claim. Instead, Alverson used a "straight [vault] calculation" and simply measured the area blasted, relying on DeLello's "statement on the size of the vault area". In addition, Alverson looked at photographs and "observed" the vault site. What would otherwise be the most reliable evidence, the actual measurement of the vault site, is, however, somewhat uncertain because the calculations were made by "pac[ing] off" the site without benefit of a tape measure, and Alverson was unable to view the actual depth of the vault.
 
 
 72
 Nonetheless, this evidence is sufficient for a reasonable juror to have concluded that EPC suffered $122,465 extra work damages by a preponderance of the evidence.
 
 3. $12,000 Additional Surveying Costs
 
 73
 The jury awarded EPC $12,000 in damages for extra survey work which it completed. We agree with the district court that the written notice provision was waived. In addition, there was enough probative evidence for the jury to conclude that surveying was MMCC's responsibility but that EPC covered the costs; thus, we cannot conclude that its verdict was "sheer surmise and conjecture." LeBlanc-Sternberg, 67 F.3d at 429.
 
 
 74
 Merritt's project manager, Don Scaglione, testified that surveying was not EPC's responsibility. DeLello testified that he put the surveyors on his payroll:
 
 
 75
 The agreement was that Dennis Capolino said to me [Jack DeLello] how are we going to get this [surveying] done? And I said the surveyors are four months late. Now, we have to have them here immediately. He said he didn't want to hire surveyors, because if he hires surveyors, it would be out of the union hall, and the union hall would thereafter on all his jobs try to enforce surveyors for all his projects. It would have been a precedent.
 
 
 76
 Jack, he [Capolino] says, you are not going to be in this area. You are doing this one job, then you go back to Colorado. He said put it on your payroll, then I don't have the burden of precedent, and I don't have the burden of operators. I said Dennis, I will do that as convenience so he can avoid operator's union having a claim for precedent.
 
 
 77
 [Q] Did you do that?
 
 
 78
 [A] Yes, I did [d]o that. I called him the next day.
 
 
 79
 Finally, even though the surveying payroll documents may not have been in evidence, the documents upon which Alverson based his $12,000 damage calculation were available, had been provided to MMCC, and were admissible. Thus there was probative evidence for EPC to carry its burden of persuasion on the survey issue, and since MMCC failed to point to any inconsistent testimony (and thereby to decrease the probative value of EPC's testimony), we cannot say that the jury's verdict was "sheer surmise and conjecture." LeBlanc-Sternberg, 67 F.3d at 429.
 
 
 80
 4. $41,167 For Additional Work Reflected in the Daily Reports
 
 
 81
 The jury awarded EPC $41,167 in damages for miscellaneous work reflected in the daily reports, such as snow and debris removal. Since these reports were produced daily, and while EPC was still on the worksite, we find that there was sufficient waiver of the notice provision. In addition, Alverson testified that the amount owed was $41,167. Again, that the daily reports were not admitted into evidence is not dispositive, for the reasons already stated. Moreover, there was apparently a stipulation covering the admissibility of the daily work reports. MMCC's objection, based on its interpretation of the stipulation that it would not have objected to the admission of the daily reports via a competent witness because it would then have had the opportunity to cross-examine the witness, is a red herring. MMCC could have used the daily report to cross-examine and impeach Alverson's conclusions. Again, we conclude that EPC offered probative evidence for the jury to reasonably conclude that EPC carried its burden of persuasion on the extra work claim based on the daily work reports.
 
 E. EVERGREEN'S DELAY DAMAGES CLAIM
 
 82
 The jury awarded EPC $157,302 in delay damages. Like the extra work provision, the subcontract included a no-damages-based-on-delays clause:
 
 
 83
 The Sub-contractor shall be entitied [sic] to no compensation or damages of any kind or nature by reason of any delay on the part of the Contractor in the prosecution by the Sub-contractor of the work called for hereunder.
 
 
 84
 Even if no-damage-for-delay clauses do not violate New York public policy, Corinno Civetta Constr. Corp. v. City of New York, 67 N.Y.2d 297, 502 N.Y.S.2d 681, 685-86, 493 N.E.2d 905, 909-10 (1986); Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 749-50, 448 N.E.2d 413, 416 (1983), and as such may be enforced, there are four exceptions to that general rule:
 
 
 85
 Generally, even with such a clause, damages may be recovered for: (1) delays caused by the contractee's bad faith or its willful, malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the contractee, and (4) delays resulting from the contractee's breach of a fundamental obligation of the contract.
 
 
 86
 Corinno, 502 N.Y.S.2d at 686, 493 N.E.2d at 910. See also Kalisch-Jarcho, 461 N.Y.S.2d at 749-50, 448 N.E.2d at 416-417 (willful or grossly negligent conduct; intentional wrongdoing). Lest the exceptions swallow the rule, delay clauses proscribe damages for a broad range of both reasonable and unreasonable delays. Corinno, 502 N.Y.S.2d at 683, 493 N.E.2d at 907; Kalisch-Jarcho, 461 N.Y.S.2d at 749-51, 448 N.E.2d at 416.
 
 
 87
 Moreover, the abandonment of the contract exception is limited to those situations where "the contractee is responsible for delays which are so unreasonable that they connote a relinquishment of the contract by the contractee with the intention of never resuming it." Corinno, 502 N.Y.S.2d at 688, 493 N.E.2d at 912. The breach of contract exception is also a narrow one and applies "only for the breach of a fundamental, affirmative obligation the agreement expressly imposes on the contractee. Typical of such claims are those in which the contractee has failed in its obligation to obtain title to the work site or make it available to the contractor so that it may commence construction of the agreed upon improvements." Id. Finally, the contractor's burden of proving the exception is a heavy one. Manshul Constr. Corp. v. Board of Educ., 160 A.D.2d 643, 559 N.Y.S.2d 260, 261 (1st Dep't), lv. to appeal denied, 76 N.Y.2d 709, 561 N.Y.S.2d 913, 563 N.E.2d 284 (1990). Therefore, the jury must have determined that Merritt had notice of the delay claims and that one of the Corinno exceptions to the delay clause applied.
 
 
 88
 The district court refused to grant MMCC's post-trial motion to set aside the delay damages verdict:
 
 
 89
 [I] find there was an evidentiary basis for the jury to read out of the Subcontract the written notice of claim requirement....
 
 
 90
 ... The record provides a clear basis for the jury's refusal to enforce the no damage for delay clause, as there was substantial testimony about bad faith and malicious conduct by MMCC, particularly Dennis Capolino. The evidence of bad faith included, among other things, the following: DeLello testified that MMCC failed to honor its repeated promises to provide surveyors that Evergreen required to begin its trench work. Both DeLello and Scaglione testified that MMCC "spoon-fed" payments to Evergreen; Evergreen was delayed in part because of a crippling lack of capital, which prevented Evergreen from hiring sufficient personnel to advance its work expeditiously. MMCC grossly inflated backcharges, in what the jury could have reasonably viewed as a willful, malicious attempt to "break" Evergreen. DeLello also testified that MMCC stole from Evergreen excavated material worth $20,000. This material had been stockpiled ... by Evergreen for use as backfill. The record is replete with evidence of Dennis Capolino's mistreatment of DeLello.
 
 
 91
 Evergreen, 890 F.Supp. at 1221-22 (footnote omitted). Regarding MMCC's claim that EPC failed to prove its damages, the district court wrote:
 
 
 92
 DeLello testified as to the cause of Evergreen's delays, and generally as to the additional costs incurred. This testimony provided a basis for apportioning the damages, and buttressed the testimony of Alverson. Alverson testified in detail about Evergreen's damages due to delay caused by MMCC. [He] described three categories of delay damages.... He calculated Evergreen's total damages due to delay as $184,032. Alverson explained the basis for this amount, including the standard industry rates for construction equipment set by the New York State Department of Transportation, the additional costs for personnel, telephones, and so forth.
 
 
 93
 Furthermore, the jury charge made it clear that delay damages were only for costs actually sustained by Evergreen and caused by MMCC. I charged the jury that "[i]f you find in favor of Evergreen on any or all of its delay claims, you may award Evergreen damages for additional costs it proves were incurred as a result of delays ... caused by [MMCC]." I further cautioned the jury to "not engage in speculation or guess-work; Evergreen must have provided you with a sufficient basis for making a reasonable calculation of damages."
 
 
 94
 Id. at 1222-23 (footnote omitted). Alverson calculated delay damages to be $167,302, to which he added a 10% profit reaching a total of $184,032.20. The jury awarded $157,302. Viewing the testimony in a light most favorable to the prevailing party, the court concluded that the evidence was legally adequate to support the jury verdict.
 
 
 95
 1. The Contention That EPC Failed to Meet Its Burden of Establishing a Delay
 
 
 96
 MMCC first argues that since the subcontract did not set a date for EPC's completion, the jury erred in accepting EPC's claim that its work was to be completed in four months. It points to the provision requiring EPC to excavate trench rock at $90 per cubic yard, and the extra work order, where EPC agreed to drill and blast mass rock at $35 per cubic yard. MMCC also argues that EPC's expert admitted that when EPC signed the subcontract it did not know the amount of trench rock and could not say it could be done in four months. Alverson also testified that the addition of the mass rock change order necessarily added completion time. MMCC argues that a reasonable time for completion should have been implied. Young v. Whitney, 111 A.D.2d 1013, 490 N.Y.S.2d 330, 331 (3d Dep't 1985) (citations omitted); United States ex rel Falco Constr. Corp. v. Summit Gen. Contracting Corp., 760 F.Supp. 1004, 1012 (E.D.N.Y.1991) (reasonable time depends upon the facts and circumstances of each case) (citations omitted).
 
 
 97
 The jury did not have to accept EPC's claim that the work was to be completed in four months to find for EPC on its delay claim. The Corinno exception, based on uncontemplated delay, anticipates this situation: "[E]ven broadly worded exculpatory [delay] clauses ... are generally held to encompass only those delays which are reasonably foreseeable, arise from the contractor's work during performance, or which are mentioned in the contract." Id. at 686, 493 N.E.2d at 910. For example, if the mass rock excavation itself had taken four months (the supposed time frame for EPC's participation in the project) and then the laying of the pipelines had taken another four months, we doubt EPC would have a delay damages claim because the compensation for the mass rock exhumation was to be made on a cubic-yard basis. This type of delay is contemplated and falls outside the ambit of the Corinno exceptions. However, EPC based its delay damages claim at least in part on the lack of surveyors, which was uncontemplated, unreasonable and directly interfered with the work which EPC had contracted to complete.
 
 
 98
 Similarly, the bad faith exception focuses on the contractee's conduct and how it impacted the contractor's performance, more than the parties' intent regarding the time to complete. In sum, the jury need not have found that the parties intended for Evergreen to complete its work in four months for the Corinno exceptions to apply.
 
 
 99
 2. The Contention that EPC Proof of Delay Damages was Inadequate as a Matter of Law
 
 
 100
 Delay damages are measured by "the difference between the contract price ... to do the [job] and ... total job costs, including overhead and profits, if applicable." Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1010 (2d Cir.1991) (citing Columbia Asphalt Corp. v. New York, 70 A.D.2d 133, 420 N.Y.S.2d 36, 38-39 (3d Dep't 1979), lv. to appeal denied, 49 N.Y.2d 702, 426 N.Y.S.2d 1027, 403 N.E.2d 459 (1980); Whitmyer Bros., Inc. v. New York, 63 A.D.2d 103, 406 N.Y.S.2d 617, 620 (3d Dep't), aff'd 47 N.Y.2d 960, 419 N.Y.S.2d 954, 393 N.E.2d 1027 (1979)). Only actual costs will be awarded. Alverson testified that EPC incurred $62,826 in equipment standby costs; $81,338 in extended field costs; and $23,138 in general field conditions, which included a reasonable salary for a field superintendent. To this he added a 10% profit and overhead for a total delay damage claim of $184,032.20. Merritt argues that EPC's proof of delay damages was inadequate as a matter of law because it was only offered by EPC's expert, whose opinions were not based on any foundation testimony or documents. We think plaintiff's expert testimony was sufficient for a reasonable juror to conclude that plaintiff had carried its burden of persuasion on the damages issue. Any lack of detail as to the amount of damages could have been explored on cross examination and goes to the weight of the evidence, not the existence of evidence.
 
 
 101
 3. The Contention That MMCC Was Improperly Held Responsible For All Delays
 
 
 102
 MMCC also argues that the delay damage verdict should be reversed because it was improperly held responsible for all of EPC's delay claims. Delay damages should be apportioned among responsible parties. Wolff & Munier, 946 F.2d at 1010 (citing Columbia Asphalt, 420 N.Y.S.2d at 38-39; Fehlhaber Corp. v. New York, 410 N.Y.S.2d at 920, 928 (3d Dep't 1978), lv. to appeal denied, 48 N.Y.2d 604, 421 N.Y.S.2d 1029, 396 N.E.2d 486 (1979)). EPC's president and expert both admitted that its delay claim failed to consider its own fault in delay, even though the Army Corps of Engineers halted EPC's blasting operations for safety reasons for two or two and-a-half weeks. In addition, both DeLello and Alverson admitted that EPC would not have had a sufficient workforce or equipment when it was first on the site if there had been contract work available as anticipated; that there were weather-caused delays which Alverson testified he discounted; and layout was EPC's responsibility, except for surveying for the drainage structures. Apparently based on that testimony, the jury did apportion damages, as it was required to do by the instructions: it awarded $157,302, rather than the $184,032.20 claimed by EPC. We think there was an adequate basis, even if just barely, for that award.
 
 
 103
 4. The Contention That The Notice Provision Was Not Waived
 
 
 104
 EPC's president testified that mandatory notice was not given and that the first written notice to MMCC of EPC's delay claim was its complaint. MMCC claims that this failure alone warrants reversal on this issue, relying on Port Chester Elec. Constr. Corp. v. HBE Corp., 978 F.2d 820 (2d Cir.1992). The district court wrote:
 
 
 105
 As discussed above [in the extra work section], I find there was an evidentiary basis for the jury to read out of the Subcontract the written notice of claim requirement. Hence, plaintiff was not barred by the requirement of a written notice of claim from pursuing its claim for delay damages.
 
 
 106
 Evergreen, 890 F.Supp. at 1221. But just because the notice provision was waived for purposes of the extra work claim, supra, does not mean the same provision was waived for purposes of the delay damages claim. The district court held that the evidence supported the conclusion that MMCC was well aware that EPC was performing extra work, but neither the court nor EPC has indicated how MMCC was on notice of any claim for delay damages. We think the judge should make a more detailed finding of what the evidence was to support a finding of waiver as to the delay damages clause. See Port Chester, 978 F.2d at 823 ("Because we do not know for which delays the district court will hold [defendant] responsible, we leave it to that court to decide in the first instance the adequacy of the pertinent notices of claim.") Therefore, we vacate the district court's decision not to grant judgment as a matter of law as to the delay damages claim. On remand, the district court's review of the record should determine what evidence, if any, would have supported the jury's verdict as to waiver of this notice provision. Obviously, if it finds such evidence, the court should identify and specify what it was. On the other hand, if the district court finds insufficient evidence to support the jury's verdict on this issue, it should either dismiss the claim as a matter of law or, after reviewing the jury instructions on the issue, if it finds that the jury was insufficiently instructed, the district could should include the issue in the new trial that must be held with respect to the cost-to-complete issue.
 
 F. MERRITT MERIDIAN'S COSTS TO COMPLETE
 
 107
 The jury found EPC not liable for breach of contract and refused to grant MMCC any completion costs for unfinished work after EPC left the worksite. On a post-trial motion, defendants requested a new trial on the cost-to-complete issue, claiming that its costs were $305,357; the district court denied the motion but did reduce EPC's award by $30,398--the amount Alverson "essentially" conceded as MMCC's costs to complete the project.[6] MMCC and GICA agree with the district court that the jury erred in failing to credit MMCC any completion costs but appeal the decision of the district court denying it a new jury trial on the issue.
 
 
 108
 There are many ways in which a judge controls a jury. Federal district court judges determine the admissibility of evidence, see, Fed.R.Evid. 104, 402, 403; they may summarize and comment on the evidence, see, e.g., United States v. Filani, 74 F.3d 378, 385 (2d Cir.1996) (criminal); Zinman v. Black & Decker (U.S.), Inc., 983 F.2d 431, 436 (2d Cir.1993) (civil) (citing Ah Lou Koa v. American Export Isbrandtsen Lines, 513 F.2d 261, 263 (2d Cir.1975)); they may question a witness, see e.g., Anderson v. Great Lakes Dredge & Dock Co., 509 F.2d 1119, 1131 (2d Cir.1974); they instruct the jury on the law to apply; and under certain circumstances judges may grant summary judgment, Fed.R.Civ.P. 56(c), and judgment as a matter of law, Fed.R.Civ.P. 50(a). Once a jury is given the opportunity to decide an issue, its decision is still somewhat reviewable:
 
 
 109
 The judge may not substitute the verdict he would have rendered on the evidence for that actually rendered by the jury. But he may avoid what in his professionally trained and experienced judgment is an unjust verdict by vacating it and causing the matter to be tried again by a second jury. Thus, the essential institution of jury trial is respected and an expedient middle ground is maintained between the absence of any control over a jury's verdict on conflicting evidence, on the one hand, and judicial usurpation of the fact finding function, on the other.
 
 
 110
 Crane v. Consol. Rail Corp., 731 F.2d 1042, 1047 (2d Cir.) (quoting Lind v. Schenley Industries, 278 F.2d 79, 91 (3d Cir.) (en banc ) (Hastie, J., dissenting), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)), cert. denied, 469 U.S. 854, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984).
 
 
 111
 Here, the jury instructions mentioned that any award to EPC could be reduced by the costs MMCC incurred to complete EPC's work. Despite EPC's expert's admission that MMCC incurred just over $30,000 in costs to complete, the jury ignored the evidence and refused to award MMCC any such costs. The district court certainly did not err in concluding that the jury failed to properly complete its task. The lower court did, however, usurp the jury's role by concluding that MMCC's costs were $30,398. Because the district court was faced with conflicting evidence--EPC's expert testimony compared with MMCC's documentation of its costs--it should have granted a new trial on the cost-to-complete issue. See Fed.R.Civ.P. 59(a)(1); In re Peterson, 253 U.S. 300, 310, 40 S.Ct. 543, 546, 64 L.Ed. 919 (1920) ("No one is entitled in a civil case to trial by jury unless and except so far as there are issues of fact to be determined."); Walker v. New Mexico & SPR Co., 165 U.S. 593, 596, 17 S.Ct. 421, 422, 41 L.Ed. 837 (1897) ("[The Seventh Amendment] requires that questions of fact in common law actions shall be settled by a jury, and that the court shall not assume directly or indirectly to take from the jury or to itself such prerogative."). Therefore, we vacate the district court's decision regarding the cost-to-complete issue and remand for a jury trial on that question. We note that since the jury answered special interrogatories directed to, inter alia, the issue of MMCC's costs to complete, a partial new trial on that issue is appropriate "because it clearly appears that [that issue is] sufficiently distinct and separable from the others [and] that a trial of [that issue] alone may be had without injustice." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 23 (2d Cir.1996) (per curiam ) (internal quotations and citations omitted).
 
 G. SANCTIONS, ATTORNEYS' FEES, AND COSTS
 
 112
 The district court sanctioned MMCC $35,000 for its Rule 11 violations against EPC and $50,000 for its Rule 11 violations against TPI. On appeal, EPC seeks, pursuant to Rule 11, 28 U.S.C. § 1927 (1994), or the court's inherent power, its lodestar amount against MMCC and GICA; TPI seeks additional Rule 11 sanctions from MMCC.
 
 
 113
 A district court's decision to award sanctions is reviewed for an abuse of discretion. Under the American Rule, the cost of attorneys' fees is not ordinarily shifted onto the losing party. Oliveri v. Thompson, 803 F.2d 1265, 1271 (2d Cir.1986) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616-17, 44 L.Ed.2d 141 (1975)), cert. denied, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Therefore, any sanction or shifting of fees and costs which is made, need not reflect actual expenditures.
 
 
 114
 Since Rule 11 applies only to pleadings, motions, and other papers, the lodestar amount is clearly inappropriate because it would shift a far greater proportion of attorneys' fees than those which were incurred because of any meritless pleading, motion or other paper. In addition, not all of MMCC's claims were meritless. The district court credited MMCC for its costs to complete and we are vacating and remanding the delay damages award; and, EPC should not recover costs incurred for the prosecution of its own prima facie business tort and punitive damages claims, both of which were dismissed as a matter of law. It is clear that the district court did not abuse its discretion in failing to award EPC its lodestar amount pursuant to Rule 11.
 
 
 115
 In addition, § 1927 applies to attorneys, not parties, and thus it cannot provide the basis for the award of fees against a party. See, e.g., United States v. International Brotherhood of Teamsters, et al., 948 F.2d 1338, 1345 (2d Cir.1991); Oliveri, 803 F.2d at 1273. Finally, lest the court's inherent powers swallow the American Rule, awards made pursuant to this power are to be made "restrictively." Id., at 1272 (citing Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (2d Cir.1986)). Therefore, the district court did not abuse its discretion in refusing to impose a greater sanction.
 
 H. OTHER FEES AND COSTS
 
 116
 Evergreen argues that the district court abused its discretion in making the awards for other fees and costs. Specifically, EPC sought $8,708.67 in process server fees and witness fees, but was awarded only $429.46; it sought $17,690.78 in photocopying costs but was awarded $5,000; it sought $31,125.05 in expert witness fees, all of which were denied; and it sought $4,608.04 in electronic computer research costs, which were also denied in full.
 
 
 117
 Generally, Fed.R.Civ.P. 54(d) allows the district court to award the prevailing party its costs. However, the types of witness fees which may be shifted are limited by 28 U.S.C. § 1821 (1994), and the types of costs which may be shifted are limited by 28 U.S.C. § 1920. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441-42, 107 S.Ct. 2494, 2497-98, 96 L.Ed.2d 385 (1987). In other words, the district court has no discretion to award costs not authorized by statute or contractual provision. See id. at 439, 445, 107 S.Ct. at 2496, 2499 (party's own expert witness fees). But if costs are authorized, the determination of amounts is vested in the sound discretion of the district court. Fed.R.Civ.P. 54(d); Furman v. Cirrito, 782 F.2d 353, 355 (2d Cir.1986).
 
 1. Process Server and Witness Fees
 
 118
 EPC issued and served 29 subpoenas, with a cost of $1,526.20 in process server fees and $1,773.20 in witness fees in 1991, when the case was originally set for trial. However, because of an inadequate jury pool the case could not be tried that term (EPC Brief at 40; GICA Brief at 39 n.17). The case was again set for trial in 1994, and EPC issued and served 55 subpoenas, with process server costs of $2,389.75 and witness fees of $3,019.52. EPC appeals the award of $429.46, arguing that the district court abused its discretion in making such a small award when its costs were so great.
 
 
 119
 a. Process Server Fees
 
 
 120
 A prevailing party will not be entitled to private process server fees if there is no statutory authority for shifting them. Some courts have shifted private process server costs pursuant to § 1920(1). E.g., Alflex Corp. v. Underwriters Laboratories, Inc., 914 F.2d 175, 177-78 (9th Cir.1990) (per curiam ) (based on § 1920(1) at least in part), cert. denied, 502 U.S. 812, 112 S.Ct. 61, 116 L.Ed.2d 36 (1991); Tang How v. Edward J. Gerrits, Inc., 756 F.Supp. 1540, 1545 (S.D.Fla.1991), aff'd 961 F.2d 174 (11th Cir.1992); Card v. State Farm Fire & Casualty Co., 126 F.R.D. 658, 662 (N.D.Miss.1989), aff'd w/o opinion, 902 F.2d 957 (5th Cir.1990). However, we must follow the Crawford reasoning, and we concur with the Eighth Circuit that the plain language of § 1920 clearly does not authorize the shifting of private process fees. Crues v. KFC Corp., 768 F.2d 230, 234 (8th Cir.1985). See also Zdunek v. Washington Metro. Area Transit Auth., 100 F.R.D. 689, 692 (D.D.C.1983); Goldstein v. GNOC, Corp., No. 90-0496, 1994 WL 456360 at * 2-3 (E.D.Pa. Aug. 22, 1994).
 
 
 121
 Courts have found other authority for shifting private process server fees. At least one other court within this circuit has allowed the cost when it is reasonable. Big R Food Warehouses v. Local 338 RWDSU, 896 F.Supp. 292, 299-300 (E.D.N.Y.1995) ($55). But reasonableness is the analysis we apply when the fees have been granted; it does not provide any authority for granting the fees in the first instance. Other courts have shifted the fee pursuant to a local rule. See, e.g., Cody v. Private Agencies Collaborating Together, Inc., 911 F.Supp. 1, 6 (D.D.C.1995) (Local Rule 214(d) subpart 11); Coulter v. Newmont Gold Co., 873 F.Supp. 394, 395 (D.Nev.1994) (Local Rule 205-2). However, there is no local rule in the Southern District of New York that is relevant. Finally, some courts have shifted the cost because of the "trend toward substitution of private process servers for the U.S. Marshals Service." Riofrio Anda v. Ralston Purina Co., 772 F.Supp. 46, 55 (D.P.R.1991), aff'd, 959 F.2d 1149 (1st Cir.1992); Roberts v. Homelite Div. of Textron, Inc., 117 F.R.D. 637, 640-41 (N.D.Ind.1987). At least one court has specifically read § 1921(a)(1) in conjunction with § 1920(1) and allowed these costs. Griffith v. Mt. Carmel Medical Ctr., 157 F.R.D. 499, 507-08 (D.Kan.1994):
 
 
 122
 Although § 1920(1) refers simply to "fees of the marshal," it must be read in light of § 1921 which states that "the marshals or deputy marshals shall routinely collect, and a court may tax as costs, fees for ... [s]erving ... process in any case or proceeding [and] [s]erving a subpoena or summons for a witness." ... Given the apparent congressional intent to make service of process a taxable item, [citing Alflex, supra ] and "due to the substitution of private process servers for the U.S. Marshal Service in recent years," [citing Roberts, supra ] the court believes the taxation of costs for special process servers is justifiable. However, such costs should be taxable only to the extent that they do not exceed the costs that would have been incurred had the Marshal's office effected service, since only the Marshal's fee amount is actually statutorily authorized.
 
 
 123
 (other citations omitted). We think this provides the most persuasive basis for allowing the award of private process server fees should the district court have chosen to award them. However, this interpretation does not mandate that the court's discretion be exercised in that fashion, and thus the district court did not abuse its discretion in declining to award process server fees for 1991 or 1994.b. Witness Fees
 
 
 124
 There is a general presumption that only the costs of those witnesses who actually testify at trial may be shifted. Moreover, the presumption "can be overcome if it appears that a court order or some other extrinsic circumstance rendered his testimony unnecessary." McGuigan v. CAE Link Corp., 155 F.R.D. 31, 35-36 (N.D.N.Y.1994) (quoting 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2678 at 377 (2d Ed.1983)).
 
 
 125
 Since the 1991 trial was cancelled for reasons beyond EPC's control (i.e., lack of a jury pool), they should have been awarded witness fees and travel expenses for those who were subpoenaed in 1991 and actually testified in 1994. The amount awarded roughly covered the fees and expenses of the three who were on both lists and the four on the 1994 list. We decline to find that the district court abused its discretion inasmuch as there is no evidence that those others did not testify for some objective reason such as a stipulation as to what they would say, see, id., 155 F.R.D. at 35, 36 (citation omitted), or because the court decided their testimony would be redundant, see Marino v. Town of Kirkland, New York, 146 F.R.D. 49, 51 (N.D.N.Y.1993).
 
 2. Photocopying Costs
 
 126
 Evergreen sought $17,690.78 in photocopying costs but was awarded $5,000, and now appeals the district court's award. 28 U.S.C. § 1920(4) allows the costs of "exemplification and copies of papers necessarily obtained for use in the case" to be shifted. Photocopying costs may be recovered even though the underlying document was not admitted at trial. M.T. Bonk Co. v. Milton Bradley Co., 945 F.2d 1404, 1410 (7th Cir.1991) (photocopying costs which are reasonably incurred). Evergreen did not, however, itemize those costs or explain why all those copies were necessary. Since $5,000 represented the court's "estimate of the cost of photocopying the exhibits offered at trial and other papers submitted by plaintiff in connection with [the] trial," Evergreen, 890 F.Supp. at 1228, it appropriately cabined its discretion. The $5,000 award was not an abuse of discretion.
 
 3. Expert Witness Fees
 
 127
 The district court was clearly correct in denying expert witness fees. We are at a loss to see how Evergreen could seek them in light of Crawford and West Virginia Univ. Hosp., Inc. v. Casey, 499 U.S. 83, 86-87, 111 S.Ct. 1138, 1140-41, 113 L.Ed.2d 68 (1991).
 
 4. Electronic Computer Research Costs
 
 128
 EPC sought $4,608.04 in Westlaw costs, which the district court denied in full. In Standley v. Chilhowee R-IV School Dist., 5 F.3d 319, 325 & n. 7 (8th Cir.1993) (citing Leftwich v. Harris-Stowe State College, 702 F.2d 686, 695 (8th Cir.1983)), the Eighth Circuit held that computer costs are part of the attorneys' fees and not to be taxed separately. See also Haroco, Inc. v. American Nat'l Bank & Trust Co. of Chicago, 38 F.3d 1429, 1440-41 (7th Cir.1994); cf. Jones v. Unisys Corp., 54 F.3d 624, 633 (10th Cir.1995) (computer research costs not statutorily authorized under 28 U.S.C. § 1920). We agree that computer research is merely a substitute for an attorney's time that is compensable under an application for attorneys' fees and is not a separately taxable cost. See, Haroco, 38 F.3d at 1441. Thus, the district court did not abuse its discretion in declining to shift the cost of this item.
 
 CONCLUSION
 
 129
 For the reasons stated above, the judgment of the Southern District of New York is affirmed in part and vacated and remanded in part for further consideration of the issue of waiver of the notice requirement concerning the damages for delay claim and for a new trial on the issue of MMCC's costs to complete work unfinished by Evergreen.
 
 
 
 *
 Honorable James B. Moran, of the United States District Court for the Northern District of Illinois, sitting by designation
 
 
 [1]
 Morse/Diesel, Inc. v. Trinity Industries, Inc., 67 F.3d 435, 437 (2d Cir.1995) (Parker, J.)
 
 
 [2]
 Judge Goettel presided over this case from August 6, 1990 to September 19, 1994, when it was reassigned to Judge Chin
 
 
 [3]
 I find that Evergreen has failed to present a legally sufficient evidentiary basis for a reasonable jury to conclude that public rights are involved in this case or that Merritt-Meridian engaged in conduct aimed at the public generally
 Evergreen has argued that its claim for punitive damages is supported by the following: Merritt-Meridian's handling of the confession of judgment and promissory note; its inflation of the backcharges, which Evergreen alleges is the equivalent of fraud or conversion; Merritt-Meridian's receipt of payment for Evergreen's work and refusal to in turn pay Evergreen; and Dennis Capolino's purported statement to Jack DeLello: "Sue me, Jack; it'll take you five years."
 While this evidence arguably may show bad faith or other morally culpable conduct on the part of Merritt-Meridian toward Evergreen, none of it was directed at the public generally. No evidence has been presented to show that public rights have been implicated.
 Even assuming that Evergreen engaged in fraud or conversion with respect to the backcharges, that does not implicate public rights. See Brink's Inc. v. City of New York, 717 F.2d , 704 [(2d Cir.1993)], where the Second Circuit suggested that Brinks' employees stealing of money from parking meter collections was insufficient to support a punitive damages award on the breach of contract claim against Brinks.... Nor can the argument be made that public rights are implicated in the present case because of the public's interest in the sanctity of contracts, because if that were the law punitive damages would be available in virtually every breach of contract case.
 
 
 [4]
 The Sub-contractor shall not perform any extra work nor make any changes in the work called for herein nor shall he be entitled to receive any extra compensation for the performance of extra work ..., unless an order in writing for the extra work ... is first given to the Sub-contractor by the Contractor and signed by its President, Secretary or Treasurer;
 (Sub-contract p 11).
 
 
 [5]
 Should the Sub-contractor deem that he has a claim or controversy arising out of or relating to this sub-contract, or the breach thereof, and which is not specifically dealt with by any other provisions hereof, then he must give the Contractor written notice thereof within 24 hours after the occurrance [sic] or event giving rise to said claim or controversy. Thereafter the Sub-contractor shall present to the Contractor in writing within five (5) days after such notice a full and complete account of the nature and circumstances of such claim or controversy, as well as any costs in connection therewith, to permit the Contractor to assess said claim or controversy, and then the Contractor shall render a written final determination thereof
 (Subcontract p 25).
 
 
 [6]
 The trial court found that part of MMCC's cost-to-complete calculations included "grossly inflated equipment charges." Evergreen, 890 F.Supp. at 1223 n. 9